UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MALINDA A. CARLSON et al.,

                              Plaintiffs,

                                                        **DECISION AND ORDER**
                                                        10-CV-455A

          v.


RAYMOUR AND FLANIGAN FURNITURE
   COMPANY et al.,

                              Defendants.

_____

**I.     INTRODUCTION**

          Pending before the Court is a motion (Dkt. No. 10) by defendants Raymour

and Flanigan Furniture Company and Raymours Furniture Company, Inc. to

compel arbitration of plaintiffs' claims against them under a third-party arbitration

agreement, and to stay this case pending the outcome of that arbitration.

Defendants make their motion pursuant to 9 U.S.C. §§ 3 and 4, which are part of

the Federal Arbitration Act, 9 U.S.C. §§ 1–16.  Defendants are not parties to the

arbitration agreement that they want enforced, and are not an agent of any such

party.  Nonetheless, defendants contend that plaintiffs' allegations of undisclosed

variations in pricing are inextricably intertwined with that agreement, such that

plaintiffs should be equitably estopped from avoiding arbitration.  Plaintiffs

contend that their allegations concern the advertising and negotiations for the

furniture purchase itself, and not the maintenance of the store credit card connected to the arbitration agreement, thus making the credit card's arbitration agreement inapplicable to this case.  The Court held oral argument on January 20, 2011 and received supplemental briefing from the parties on February 3, 2011.  For the reasons below, the Court finds that it lacks subject-matter jurisdiction over plaintiff's claims and dismisses the complaint without reaching the merits of the pending motion.

II.   **BACKGROUND**

   A.   ***Plaintiffs' Furniture Purchase***

This case concerns allegations that defendants fail to tell customers in advance that they prefer cash purchases and that they negotiate lower sales prices for them than for purchases made through a "0% interest" credit promotion. Defendants collectively operate a furniture retail store called "Raymour & Flanagan."  Defendants operate over 90 retail locations in seven northeastern states, including New York, and have a principal place of business in Liverpool, New York.  Plaintiffs Malinda A. Carlson and Philip A. Wolf are residents of Buffalo, New York.

The impetus for this case was a furniture purchase that plaintiffs made on June 8, 2009, along with the advertising that induced that purchase.  On June 8, 2009, plaintiffs purchased several items of furniture at a Raymour & Flanagan retail store in Erie County, New York.  Plaintiffs decided to shop at Raymour &

Flanagan in response to advertising and promotions from defendants that promised "NO MONEY DOWN, NO INTEREST 'TIL 2014*."  According to plaintiffs, defendants have advertised "0% interest" sales regularly, with fine print such as the following accompanying those advertisements:

> Special terms until January 1, 2014, apply to purchases charged with approved credit to the Raymour & Flanagan card issued by Wells Fargo Financial National Bank.  The minimum monthly payment will be 1/50th of the amount financed . . . .*There will be no interest charged during the promotional period* . . . .

(Dkt. No. 1 ¶ 9 (emphasis and ellipses in the original)).  Upon arriving at Raymour & Flanagan, plaintiffs shopped for and selected various items of furniture with the help of an employee of defendants.  Furniture prices at Raymour & Flanagan are negotiable, and during price negotiations, plaintiffs indicated to an employee of defendants that they wanted to take advantage of the no-interest sales promotion.  Upon hearing this information, and before giving plaintiffs any final price, defendants had plaintiffs complete two credit applications, a primary one and a secondary, conditional one.  The primary application was an application for a Raymour & Flanagan store credit card that would be issued by Wells Fargo Financial National Bank ("Wells Fargo").  Defendants submitted that application instantly to Wells Fargo for approval.  Because plaintiffs happened to be approved, the Wells Fargo application and its associated terms (*see* below) constituted the only credit agreement that ever took effect here.  Had Wells Fargo rejected plaintiffs, plaintiffs might have been able to obtain credit anyway through

the conditional application, an application for credit directly from defendants. (*See* Dkt. No. 10-3 at 24 ("In the event your account is approved by Raymour & Flanagan Furniture, the following terms and conditions apply.").)  There is no evidence that Wells Fargo required customers to receive approval for a credit card before negotiation of the final price.  There also is no evidence that Wells Fargo knew that defendants were requiring completion of credit-card applications before announcing what the final price of any merchandise would be.

Negotiations for the furniture purchase concluded once plaintiff received approval for a store credit card from Wells Fargo.  With approval established, defendants drew up and gave plaintiffs three sales invoices showing final prices for the items of furniture that plaintiffs wanted to purchase.  The lower left corner of each sales invoice contained a disclaimer that read, "If financed, this transaction is under your credit card agreement with Wells Fargo Financial National Bank (WFFNB)."  (Dkt. No. 18-2 at 11, 13, 15.)  The back of each sales invoice noted that all sales are final and that "[n]o additional conditions or terms will be binding on Raymour & Flanagan unless they are in writing and written on the face of this agreement."  (*Id.* at 12, 14, 16.)  Plaintiffs signed the sales invoices and thereby completed their purchase.

### B.  *Credit Card Agreement with Wells Fargo*

The store credit card for which plaintiffs applied was governed by an agreement with Wells Fargo titled the Credit Card Account Agreement ("Wells

Fargo Agreement").  The Wells Fargo Agreement was between only plaintiffs and

Wells Fargo.  (*See* Dkt. No. 18-2 at 5 ("The word 'account' refers to the credit

card account you [plaintiffs] have with us [Wells Fargo].").)  The Wells Fargo

Agreement did not designate Raymour & Flanagan as an agent of Wells Fargo

for any purpose; in fact, defendants confirmed at oral argument that they are not

agents of Wells Fargo.  The Wells Fargo Agreement designates Raymour &

Flanagan only as a "retailer."  Wells Fargo concedes in the Wells Fargo

Agreement that it cannot make any retailer accept the credit card for payment.

(*See id.* ("We are not responsible for the refusal of anyone to honor your card.").)

So long as a credit card user who charged a no-interest purchase paid the

monthly balance in full, Wells Fargo explicitly would not charge any fees for

maintaining the credit card.  (*See id.* at 6 ("NO INTEREST.  If a sales slip says

there is no interest, it means that there is no finance charge on the special

subaccount containing the items sold on that sales slip until the no interest

special terms end.  You may avoid finance charges on a no interest special

subaccount by paying the balance of that special subaccount in full before the no

interest special terms end.").)[1]  The rest of the Wells Fargo Agreement contains

terms pertaining to interest rates, monthly payment due dates, minimum

balances, and cash advances.

------------------------------------------------

[1] Although the parties have not clarified whether the notation "Finance Terms: 13N" on the sales invoices officially designates plaintiffs' purchase as free of interest, they have not disputed that plaintiffs made a no-interest purchase.

The Wells Fargo Agreement contains an arbitration agreement within it. The arbitration agreement is between plaintiffs and Wells Fargo and subjects to arbitration claims "arising out of or relating to your Credit Card Account Agreement, or any prior or future dealings between us." (*Id.* at 8.)  The arbitration agreement on its face does not address any "prior or future dealings" between customers and retailers.

### C.   *Discovery of Defendants' Alleged Conduct*

Plaintiffs' relationship with defendants deteriorated once they realized that defendants secretly reduced the room for price negotiation when plaintiffs would not pay cash.  According to plaintiffs, if they had paid cash then they would have negotiated a final price first and then paid that price.  Defendants allegedly would have offered a lower price for the furniture in exchange for the immediate compensation of the cash payment.  Because plaintiffs chose instead to pay with credit, defendants allegedly raised the lowest price to which they would negotiate, and for no reason other than plaintiffs' decision to pay by credit.

In other words, the core of plaintiffs' complaint is that defendants do not disclose in their advertising or at any time before completing a sale that, all things being equal, the final price—and the leeway for negotiation—for any given piece of furniture will differ based on whether a customer pays by cash or by credit. Assuming for purposes of this motion that plaintiffs' core allegation is true, there is no evidence that Wells Fargo directed this discrepancy, encouraged it, knew

about it, or benefitted from it in any way.  In fact, Wells Fargo is not named in the complaint.  (*See also* Dkt. No. 29 at 3 ("[T]he plaintiffs *do not* allege (or have) a dispute with WF; *do not* allege that R&F is an agent of WF; and *do not* rely upon *any* WF documents for their TILA claims against R&F.").)

### D.   *Plaintiffs' Complaint*

In response to the undisclosed discrepancy between cash and credit purchases, plaintiffs filed a complaint on June 2, 2010.  The complaint contains four claims.  In the first claim, plaintiffs accuse defendants of violating the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1667f, by failing to disclose higher prices for credit purchases.  In the second claim, plaintiffs accuse defendants of violating the following state-level consumer-protection laws that prohibit deceptive practices in each of the states in which defendants do business:[2]

> 1.   N.Y. Gen. Bus. Law § 349(a) (McKinney 2011) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); *see also id.* § 350 ("False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.");

_____

[2] Plaintiffs cited a range of sections for each statute.  The Court here quotes only the main prohibitions from the statutes.

2.      N.J. Stat. Ann. 56:8-2 (West 2011) ("The act, use or

employment by any person of any unconscionable commercial

practice, deception, fraud, false pretense, false promise,

misrepresentation, or the knowing, concealment, suppression,

or omission of any material fact with intent that others rely

upon such concealment, suppression or omission, in

connection with the sale or advertisement of any merchandise

or real estate, or with the subsequent performance of such

person as aforesaid, whether or not any person has in fact

been misled, deceived or damaged thereby, is declared to be

an unlawful practice.");

3.      73 Pa. Stat. Ann. § 201-3 (West) ("Unfair methods of

competition and unfair or deceptive acts or practices in the

conduct of any trade or commerce as defined by subclauses

(i) through (xxi) of clause (4) of section 2 of this act and

regulations promulgated under section 3.1 of this act are

hereby declared unlawful.");

4.      Del. Code Ann. tit. 6, § 2513(a) (Westlaw 2011) ("The act, use

or employment by any person of any deception, fraud, false

pretense, false promise, misrepresentation, or the

concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment,

suppression or omission, in connection with the sale, lease or

advertisement of any merchandise, whether or not any person

has in fact been misled, deceived or damaged thereby, is an

unlawful practice.");

5.   Conn. Gen. Stat. Ann. §42-110b(a) (West 2011) ("No person

shall engage in unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or

commerce.");

6.   Mass. Gen. Laws Ann. ch. 93A, § 2 (West 2011) ("Unfair

methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce are hereby

declared unlawful."), *held preempted on other grounds by*

*Catanzaro v. Experian Info. Solutions, Inc.*, 671 F. Supp. 2d

256 (D. Mass. 2009); and

7.   R.I. Gen. Laws Ann. § 6-13.1-2 (West 2011) ("Unfair methods

of competition and unfair or deceptive acts or practices in the

conduct of any trade or commerce are declared unlawful.").

In the third claim, plaintiffs accuse defendants of common-law unjust enrichment.

In the fourth claim, plaintiffs seek a permanent injunction prohibiting defendants

from engaging in deceptive business practices.

9

### E.   *Defendants' Motion to Compel Arbitration and to Stay Litigation*

In response to plaintiffs' complaint, defendants filed the pending motion to compel arbitration and to stay litigation on August 2, 2010.  In support of their motion, defendants contend that the doctrine of equitable estoppel requires plaintiffs to arbitrate their claims under the terms of the Wells Fargo Agreement. According to defendants, plaintiffs agreed to an arbitration clause in both their application for Wells Fargo credit and their application for Raymour & Flanagan credit.  As a result, even though the Raymour & Flanagan agreement never took effect, plaintiffs as a matter of equity agreed to arbitrate no matter what the circumstances.  Additionally, defendants contend that they have a special relationship with Wells Fargo because the credit card in question can be used only for purchases with them and because the credit-card account was created only through their efforts.  Finally, defendants contend that plaintiffs' claims are inextricably intertwined with their credit-card account because plaintiffs would not have been able to purchase their furniture on no-interest terms but for the creation of the credit-card account by Wells Fargo.

Plaintiffs oppose the motion on the grounds that their claims have nothing to do with the Wells Fargo credit-card account in itself.  Plaintiffs contend that Wells Fargo had nothing to do with defendants' decision to charge higher prices for credit purchases, and that defendants' decision manifests itself in the sales invoices and not the Wells Fargo billing statements.  Additionally, plaintiffs

contend that defendants misunderstand the meaning of the term "intertwined" in the doctrine of equitable estoppel.  According to plaintiffs, two events are intertwined under that doctrine when the occurrence of one is integral to the occurrence of the other, not when the events are simply related in some way. Plaintiffs conclude that defendants' decision to negotiate differently based on method payment is not integral to any credit-card accounts or other services that Wells Fargo offers.

## III.   DISCUSSION

### A.     *Jurisdiction to Compel Arbitration*

Before the Court addresses whether plaintiffs must arbitrate their claims against defendants under the terms of the Wells Fargo Agreement, it will resolve a serious tension running through plaintiffs' complaint and opposition papers.  On the one hand, plaintiffs have invoked the TILA, a statute written to address the congressional finding "that economic stabilization would be enhanced and the competition among *the various financial institutions and other firms engaged in the extension of consumer credit* would be strengthened by the informed use of credit."  15 U.S.C. § 1601(a) (emphasis added).  Accordingly, the entire purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  *Id.*  The

11

TILA thus was written with *lenders* in mind, to require them to help consumers understand that buying on credit is a serious responsibility that requires careful consideration of the interest rates, fees, and other conditions involved.  Invoking the TILA, therefore, implies some kind of liability on the part of Wells Fargo, the only lender in this case.  On the other hand, however, plaintiffs have denied emphatically that Wells Fargo has any knowledge of defendants' conduct and has anything at all to do with this case.  Plaintiffs' decision to cite to the unfair-trade prohibitions in every state where defendants do business underscores that this case has to do with false advertising and disclosure of negotiation tactics, not with lending and credit in themselves.  The side effect of plaintiffs' emphasis on state-level claims for unfair trade, however, is that they have placed in doubt whether they have a federal claim at all.  Without a federal claim, the Court has no jurisdiction to rule on the pending motion.

To resolve the tension in plaintiffs' arguments, the Court will examine whether it has jurisdiction over this case and over the pending motion.  "Although neither party has suggested that we lack . . . jurisdiction, we have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*."  *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) (citation omitted); *see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) ("The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties . . . .

Federal courts are courts of limited jurisdiction.").  In the particular context of motions to compel arbitration, the need to examine jurisdiction comes from an important limitation on court authority in Section 4 of the Federal Arbitration Act. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court *which, save for such agreement, would have jurisdiction under Title 28*, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4 (emphasis added).  "A federal court may 'look through' a § 4 petition to determine whether it is predicated on an action that 'arises under' federal law . . . .  The phrase 'save for [the arbitration] agreement' indicates that the district court should assume the absence of the arbitration agreement and determine whether it 'would have jurisdiction under title 28' without it."  *Vaden v. Discover Bank*, ___ U.S. ___, 129 S. Ct. 1262, 1273 (2009) (alteration in original) (citation omitted).  As is well known, this Court can have subject-matter jurisdiction in only three ways: diversity jurisdiction under 28 U.S.C. § 1332; federal-question jurisdiction under 28 U.S.C. § 1331; and supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

1.    *Diversity Jurisdiction*

The Court's consideration of diversity jurisdiction will be brief.  "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ."  28 U.S.C. § 1332(a)(1). Here, plaintiffs themselves have admitted in their complaint that diversity jurisdiction is not possible because all parties are New York citizens. Accordingly, diversity of citizenship cannot be a source of jurisdiction.

2.    *The TILA and Subject-Matter Jurisdiction*

Consideration of federal-question jurisdiction is central to the Court's inquiry.  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The federal law that plaintiffs have put in question here is the TILA and its master directive that "a creditor or lessor shall disclose to the person who is obligated on a consumer lease or a consumer credit transaction the information required under this subchapter."  15 U.S.C. § 1631(a).  Plaintiffs assert that defendants are "creditors" for purposes of the TILA under a provision that states that "in the case of an open-end credit plan involving a credit card, the card issuer and any person who honors the credit card and offers a discount which is a finance charge are creditors."  15 U.S.C. § 1602(f).

The definition of "creditor" on which plaintiffs rely requires, in turn, an examination of several of its terms.  The phrase "open-end credit plan" means "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance."  15 U.S.C. § 1602(i).  Whether the Wells Fargo Agreement constitutes an "open-end credit plan" is doubtful because plaintiffs entered it only for one long-term purchase.  *But see Benion v. Bank One, Dayton, N.A.*, 144 F.3d 1056, 1058 (7th Cir. 1998) ("[T]he creditor must reasonably contemplate repeated transactions.  This means that the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension . . . .  The fact that a particular consumer does not return for further credit extensions does not prevent a plan from having been properly characterized as open-end.  Nowhere does the statute, regulation, or staff commentary specify a minimum number of repeat purchases that must either be contemplated or occur.") (alterations in original) (internal quotation marks and citation omitted).  Even if the Wells Fargo Agreement constituted an "open-end credit plan" for purposes of a review of jurisdiction, however, plaintiffs cannot establish that defendants meet either of the criteria for defining a "creditor" under such a plan.  Under the first criterion, defendants would have to be the entities that issued the credit card in question.  Defendants did not issue plaintiffs'

credit card.  Under the second criterion, defendants would have to be entities that both honor the credit card in question *and* offer a discount that qualifies as a finance charge under the TILA.  Defendants, as retailers, arguably did honor plaintiffs' credit card by submitting a charge against it.  However, defendants' alleged willingness to offer more leeway in negotiations for cash purchases does not constitute a finance charge under the TILA.  *See* 12 C.F.R. § 226.4(c)(8) ("The following charges are not finance charges: . . . Discounts offered to induce payment for a purchase by cash, check, or other means . . . .").  Under these circumstances, plaintiffs cannot fit defendants under the definition of "creditor" on which they have relied.  Without creditor status, defendants cannot face liability under the TILA.  Since plaintiffs have no other federal claims in their complaint, the Court finds that it lacks federal-question jurisdiction.

### 3. *Supplemental Jurisdiction*

Supplemental jurisdiction generally provides this Court with a third potential source of jurisdiction in any given case but will not help plaintiffs here.  "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Section 1367(c) provides an important

16

exception to the general rule for supplemental jurisdiction.  "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367(c)(3); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.  Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims . . . .") (citations omitted).  In fact, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *Id.* (citations omitted); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citations omitted).  Here, the Court has dismissed plaintiffs' federal claim before discovery and even before defendants answered the complaint.  The remaining claims concern state-level unfair-trade statutes and state-level common-law theories of unjust enrichment.  Since so little litigation has occurred in this Court, plaintiffs will not suffer prejudice if the Court dismisses the remaining claims and leaves plaintiffs free to pursue those claims in state court. The Court thus declines to exercise supplemental jurisdiction over any of plaintiffs' remaining claims.

In sum, after a review of all possible sources of jurisdiction over this case, the Court finds that it lacks original jurisdiction and declines to exercise supplemental jurisdiction.  Without jurisdiction over the case, the Court denies the pending motion to compel arbitration without prejudice to renew in state court as defendants may deem appropriate.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court dismisses plaintiffs' complaint for lack of subject-matter jurisdiction.  The Court accordingly denies defendants' motion to compel arbitration and to stay litigation (Dkt. No. 10).  The Clerk of the Court is directed to close this case.

SO ORDERED.

_s/ Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: March 23, 2011